IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

E&G FRANCHISE SYSTEMS, INC.,

                Plaintiff,

v.

AUBREY JANIK and THE JANIK
GROUP, LLC,

                Defendants.

OPINION AND ORDER

18-cv-416-wmc

---

      In its amended complaint, plaintiff E&G Franchise Systems, Inc., asserts claims for breach of contract, trademark infringement and trade dress infringement against its former franchisee defendant Aubrey Janik and The Janik Group, LLC.  Before the court is plaintiff's renewed motion for preliminary injunction, arguing this relief is warranted by defendants' continued trade dress infringement and operation of a "Competitive Business," as that term is defined in the parties' franchise agreement, at the location of Janik's prior franchised restaurant.  (Dkt. #42.)  The court scheduled a hearing on plaintiff's motion on November 1, 2017, but a review of plaintiff's proposed facts in support of that motion demonstrate that a hearing is unnecessary.  Instead, for the reasons that follow, the court concludes that plaintiff E&G has failed to demonstrate:  (1) a better than negligible likelihood of success with respect to proving its trade dress infringement claim and (2) likelihood of irreparable harm with respect to its breach of contract claim.  Accordingly, the court will deny plaintiff's motion.

UNDISPUTED FACTS[1]

A. **Overview of the Parties**

Plaintiff E&G Franchise Systems, Inc., is a corporation organized under the laws of the State of Wisconsin, with its principal place of business also in Wisconsin. E&G operates and licenses others to operate restaurants under the "Erbert & Gerbert's" and "Erbert and Gerbert's Sandwich Shop" marks. Defendants Aubrey Janik and defendant The Janik Group, LLC, (referred to collectively as "Janik") are a former franchisee of plaintiff, having previously operated a licensed E&G restaurant in Plano, Texas. Aubrey is the sole owner and member of the LLC. She is domiciled in Texas.

B. **Trademarks and Trade Dress**

E&G has registered a number of marks with the United States Patent and Trademark Office as detailed in its President and CEO Eric Wolf's affidavit. (Wolfe Aff. (dkt. #35) ¶ 7.) E&G contends that it has developed these marks at great expense, and the marks "have become favorably known in the minds of the purchasing public generally throughout the United States as indicating the source, origin, and quality of E&G's products and services." (Pl.'s PFOFs (dkt. #34) ¶ 8.) These facts, however, are largely irrelevant, given that plaintiff's renewed motion for preliminary injunction is not premised on a trademark infringement claim; rather, it relies on a trade dress infringement claim.

As for its trade dress claim, E&G asserts that it has developed a "distinctive food

---

[1] Unless otherwise noted, the following facts are undisputed and material to plaintiff's motion for preliminary injunction.

service system," which is "reflected in the distinctive premises of its franchises," which, in turn, "feature characteristic interior and exterior style; design, décor, furnishings, equipment layout and interior and exterior signage." (Pl.'s PFOFs (dkt. #34) ¶¶ 9, 10.) Defendants dispute this, directing the court to photographs of various E&G restaurants, which apparently show differences in the exterior and interior of these locations. (Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 10 (citing Hank Janik Decl. (dkt. #53) ¶ 2); *see also* Hank Janik Decl., Ex. 2 (dkt. #53-2).) The court will take up this dispute below.

### C. Franchise Agreement

On August 24, 2015, the parties entered into a Franchise Agreement governing the operation of an E&G restaurant in Plano, Texas. (Wolfe Aff., Ex. A (dkt. #35-1).) That Agreement granted defendants a license to use certain E&G Marks in accordance with its terms and conditions. The Agreement defines the "Marks," broadly as including "service marks, trademarks, trade dress, trade names and copyrights . . . ." (*Id.* at ¶ 2.10.) The Agreement also defines the E&G "System" to include "distinctive exterior and interior design, décor, layout and color scheme" and "exclusively designed signage, decorations, furnishings and materials." (*Id.* at ¶ 2.14.)

Plaintiff contends defendants breached various requirements of the parties' Franchise Agreement, including (among others):

- pay royalty and advertising fees;
- offer and sell food and products specified in the operations manual or approved in writing by E&G;
- maintain sufficient inventories of food products and not sell any product that are unsafe;

3

- pay all obligations of suppliers;

- purchase all items from approved E&G suppliers;

- operate the franchised business during the days and hours specified; and

- deliver monthly profit and loss statements and balance sheets within 60 days after the end of the fiscal year.

Janik agrees that the Franchise Agreement contains these requirements, but disputes that E&G approved her methods, developed sufficient distribution systems to service her restaurant in Texas or consistently enforced certain requirements (e.g., the reporting requirement).

The Agreement also contains a post-termination provision, which restricts defendants from engaging in any "Competitive Business" within 5 miles of the franchised business. (Wolf Aff., Ex. A (dkt. #35-1) ¶ 24.2.) "Competitive Business" is defined as "any quick service restaurant that derives more than 50% of its revenue from the sale of sandwiches . . . ." (*Id.* at ¶ 2.2.) The Agreement further contemplates that Janik would "make such modification or alterations to the Premises immediately upon the termination or expiration . . . as [E&G] may deem necessary, to distinguish the appearance of the Premises from that of other E&G Restaurants." (*Id.* at ¶ 23.1.) Finally, the Agreement provides that any "violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to the Company for which no adequate remedy at law will be available." (*Id.* at ¶ 24.3.)

**D. Defendants' Breach of the Franchise Agreement and Termination**

In December 2017 and January 2018, Janik failed Operations Excellence Reviews

("OER") conducted by E&G, which plaintiff contends constitutes a breach of ¶¶ 9.1, 13.1 and 13.3 of the Agreement. Acknowledging this, Janik nevertheless contends that "the failures were arbitrary and were issues that Janik had failed [] in the past without resulting in a default notice." (Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 19.)

In addition, two royalty/advertising fee payments due from defendants in February and March 2018 were returned for insufficient funds in breach of § 7.1 of the Agreement. Here, too, Janik does not dispute this, but contend that the first time she learned of the returned checks was in a subsequent default notice. E&G also points to Janik's failure to pay suppliers timely as required by ¶ 13.1 of the Franchise Agreement, though Janik purports to dispute that this was a breach, having "worked out payment plans satisfactory to those vendors." (*Id.* at ¶ 23.)

Janik also failed to provide required monthly and yearly-end statements for 2017, as well as the monthly reports for 2018 in the months before termination, as required under ¶ 19.1 of the Agreement. Janik again does not dispute this but explains that (1) the cost to prepare them was $250 per month, (2) E&G never requested any statements until the Fall of 2017 and (3) Janik was in the process of preparing the past due statements when the franchise was terminated.

Janik further acknowledges that the restaurant was closed on December 24, 2017, without advanced approval required by ¶ 13.11 of the Agreement, but would excuse the decision to close because:

> on Christmas Eve 2016, Janik had less than $100.00 in sales for the entire day. Janik pleaded with E&G to allow her to close in 2017. After E&G denied her request, Janik closed the restaurant so that her employees could spend Christmas Eve

5

with their families

(Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 22.)

Next, E&G contends that Janik failed to purchase all items necessary for the operation of the business from approved suppliers, failed to purchase E&G approved products and failed to maintain sufficient inventories, all in violation of ¶¶ 9.1, 13.1 and 13.3 of the Agreement. While purporting to dispute this, Janik simply offers as justification for her actions that E&G "failed to develop a sufficient distribution system to service Texas franchises and E&G's required supplier imposed prohibitory lead times and prices on many products, requiring Janik to purchase items from local suppliers or be forced to close." (*Id.* at ¶ 24.)

Janik was notified of these defaults on several occasions but failed to cure the majority of them. Invoking ¶ 22.1(c)(v) of the Agreement, E&G then terminated the Agreement on May 25, 2018, without notice or opportunity to cure. Janik does not dispute that E&G terminated the Agreement but contends that plaintiff violated the Wisconsin Fair Dealership Law by terminating without good cause and without an opportunity to cure. Wis. Stat. § 135.03-.04.[2] Upon termination, E&G argues that Janik was obligated to immediately cease using the Marks and "the System."

### E. Defendants' New Restaurant

Janik purports to have closed the E&G restaurant on May 29, 2018. At some time

---

[2] Consistent with this contention, defendants also assert a counterclaim for violations of the Wisconsin Fair Dealership Law, which are the subject of a motion to dismiss that just recently came under advisement. (Dkt. #42.)

after that date, Janik also acknowledges opening a new restaurant called "Nemo's." In social media posts, Aubrey Janik described Nemo's as "Plano's newest fast casual eatery," explaining that "when choosing a name for a new restaurant concept after E&G had to be closed – it felt appropriate to name it after my 10 year old Labradoodle, Nemo." (Pl.'s PFOFs (dkt. #34) ¶ 33; Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 33.) She also described Nemo's offerings as a "choose your own style . . . where you choose the ingredients you would like, and you choose how it's made," specifically noting that defendants "will continue to offer sandwiches, but we will also be adding hot sandwiches, hot and cold wraps, as well as salads to the menu." (*Id.*) A contemporaneous news report also included references to Aubrey Janik's explanation that the new business "will still be a sandwich shop." (Pl.'s PFOFs (dkt. #34) ¶ 34.) Janik does not dispute that Aubrey Janik made this statement but points out that the news article goes on to state that the location "had undergone a rebrand" and that the menu has expanded. (Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 34.)

E&G challenges the extent of Janik's rebranding, claiming that "[o]ther than cosmetic changes, [the interior design] continues to use the same color scheme, the same furnishings, the same layout, . . . and the same overall interior and exterior design." (Pl.'s PFOFs (dkt. #34) ¶ 37.) Specifically, E&G points out that Janik did not repaint the premises and is using the same front counter design and the same placement of various items (e.g., chip rack, menu boards and light fixtures). In response, Aubrey Janik avers that she has: removed all E&G trademarks, logos and specific brand decorations; covered the exterior sign; and repainted Janik's car, which previously had the E&G logo on it. E&G

7

offers no facts to the contrary. Therefore, Janik contends that all that remains is the "functional layout of a fast-casual eatery and generic décor items," using a theme around Janik's dog Nemo, other customer pets and local sports teams. (Defs.' Resp. to Pl.'s PFOFs (dkt. #50) ¶ 37.)

A customer review of Nemo's describes it is as "essentially the same as the Erbert and Gerbert's that used to be here, just better. Sandwiches are now fully customizable and even cheaper than they were under the E+G name. I already liked this place, and now it is even better." (Pl.'s PFOFs (dkt. #50) ¶ 41.) While objecting to this review as inadmissible hearsay, Janik also points out that this customer at least understands that Nemo's is a different restaurant than the one previously in the same location. Another customer review stated, "I think I just found my new sandwich shop." (*Id.* at ¶ 42.) Defendants again object on hearsay grounds, while again arguing that the statement suggests this customer is not confused about any relationship between E&G and the new sandwich shop.

Nemo's menu features 11 build your own salad options, 11 build your own wrap options, 11 build your own sub sandwich options, 12 build your own panini options and two soup options. The parties dispute whether wraps, paninis and sub sandwiches containing hot items constitute "sandwiches" under the non-compete provision. Janik further submitted evidence demonstrating that cold sub sandwiches comprised 39% of Nemo's sales in July, 28% in August and 19% in September. (Aubrey Janik Decl. (dkt. #52) ¶ 40; *id.*, Ex. 3 (dkt. #52-3).)

8

OPINION

**I. Standard of Review of Motion for Preliminary Injunction**

To prove entitlement to a preliminary injunction, plaintiff must demonstrate (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm if an injunction is not granted. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). If plaintiff meets this burden, the court next considers "any irreparable harm an injunction would cause the nonmoving party," and finally "any consequences to the public from denying or granting the injunction." *Id.* The greater the likelihood of plaintiff's success on the merits, "the less the balance of harms needs to weigh in its favor." *Id.*

Plaintiff relies on two claims to support its renewed motion for preliminary injunction: (1) infringement of E&G's trade dress; and (2) operating a "Competitive Business" on the premises of the former E&G restaurant in Plano, Texas, in violation of the Franchise Agreement. The court will assess each claim in turn.

**II. Trade Dress Infringement Claim**

In considering whether an injunction is warranted, the court first considers whether plaintiff has demonstrated a likelihood of success on the merits of these claims. To meet this initial burden, plaintiff must show that it has a "'better than negligible' chance of succeeding on the merits." *Ty, Inc. v. Jones Groups, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (quoting *Int'l Kennel Club of Chi. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)).

"Trade dress" refers to the "total image of a product, including size, shape, color

combinations, graphics, packaging and label." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir.1994). In order to prevail on its Lanham Act claim, plaintiff must show that (1) its trade dress is protectable and (2) defendants' use of the trade dress is likely to cause confusion among consumers. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998). At least for purposes of the present motion, plaintiff's claim does not get out of the starting block.

As a threshold requirement in proving that a trade dress is worthy of protection, plaintiff must first clearly identify "the discrete elements" that make up the trade dress. *See generally* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8.3 at 8-13 (5th ed. 2018) ("All courts agree that the elements of the alleged trade dress must be clearly listed and described.") (citing cases); *see e.g.*, *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at *26 (N.D. Ill. Mar. 31, 2015) (holding that trade dress infringement claim requires plaintiff to articulate the elements of its alleged trade dress; finding that color combinations satisfied that requirement).

As quoted above, the Franchise Agreement describes "distinctive exterior and interior design, décor, layout and color scheme" as an element of E&G's "System" (Wolf Aff., Ex. A (dkt. #35-1) ¶ 2.14), but plaintiff stops short of actually describing the specific elements (e.g., the design, layout or color scheme) or offering any facts in support of this representation. In their opposition, defendants correctly point out this glaring gap in plaintiff's proof. In its reply brief, plaintiff contends that Janik is "well aware of these elements" and goes on to list: (1) "combination of interior lighting fixtures"; (2) "corrugated metal on the walls and counter"; (3) "the layout of the counter space

10

specifically designed for E&G"; (4) "the layout of the tables"; and (5) "the color scheme of the location." (Pl.'s Reply (dkt. #59) 5.) Again, plaintiff offers no facts in support of this description.

Moreover, with the exception of the reference to "corrugated metal," the simple, generic identification that the trade dress includes *a* combination of light fixtures, *a* layout of counter space, *a* layout of tables and *a* color scheme -- without actually identifying what combination of light fixtures, the actual layout of the counter or tables and the actual colors used -- does not satisfy the requirement that a plaintiff pursuing a trade dress infringement claim actually identify the elements of the trade dress. *See, e.g.*, *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 890 (N.D. Ill. 1999), *opinion clarified*, No. 96 C 4660, 1999 WL 1186802 (N.D. Ill. Dec. 9, 1999) ("The Court must consider not only the general labels used to identify each element of trade dress, but must also consider the specific manner in which each element is implemented."); *Keep a Breast Found. v. Seven Grp.*, No. 11-CV-00570 BEN WMC, 2011 WL 3240756, at *2 (S.D. Cal. July 28, 2011) ("Plaintiff does not describe, or even list, the elements that compose the "overall look and feel" of their products. Defendants have not been sufficiently put on notice of the trade dress at issue.").

There is another fundamental issue with respect to providing a threshold showing that plaintiff's trade dress is entitled to protection. While plaintiff has registered a number of trademarks (*see* Wolfe Aff. (dkt. #35) ¶ 7), it has not registered its trade dress. As such, it is plaintiff's burden to demonstrate that the trade dress is not "functional." 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress

11

not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."). Plaintiff fails to address this requirement in its opening brief, or even its reply, after defendants raised it in their opposition. Moreover, this element appears missing from plaintiff's amended complaint. *See Ward v. Andrews McMeel Pub., LLC*, 963 F. Supp. 2d 222, 238 (S.D.N.Y. 2013) (dismissing complaint, finding "failure to plead non-functionality it fatal to trade dress infringement claims"). There is limited caselaw considering the nonfunctional requirement in the context of a restaurant design, as compared to a product design, but at minimum, a functional design is one that "enables a product to operate, or improves on a substitute design in some way (such as making the product cheaper, faster, lighter, or stronger)." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir, 2010). Here, the layout of the counter and tables appears to be purely functional and even the placement of lighting (e.g., above or within the menu boards) similarly so, and thus not entitled to protection.

Putting aside these issues, plaintiff's argument that it will likely be able to demonstrate that it has a protectable interest in its trade dress is limited to its representation in a brief -- again, no factual support offered -- that "E&G's franchisees are required to adhere to distinctive design and layout requirements . . . for the sake of consistent presentation to consumers." (Pl.'s Opening Br. (dkt. #33) 8.) Having failed to identify the actual elements of the trade dress, not surprisingly, plaintiff also fails to demonstrate consistent use of these undefined elements by its franchisees. *See Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1252 (10th Cir. 2016) (explaining that

plaintiff's vague descriptions of its trade dress, while insufficient, was understandable "given the variety of packaging that Forney has used on its products over the years"). Moreover, defendants have submitted evidence showing *inconsistencies* across authorized E&G franchisees, at least with respect to color scheme. (Hank Janik Decl. (dkt. #53) ¶ 2 (describing differences); *id.*, Ex. 2 (dkt. #53-2) (juxtaposing photographs of defendants' E&G restaurant with other E&G restaurants).) They have also presented evidence that other fast casual restaurants deploy a counter layout with chips, drinks and other items easily accessible, lighted menu boards and tables and chair in various combinations and heights. (*Id.*, Ex. 1 (dkt. #53-1).)[3]

Plaintiff's initial motion for preliminary injunction premised on defendants' continued use of its registered trademarks after termination of the Franchise Agreement appeared to have some merit. Understandably and necessarily, plaintiff withdrew that motion based on defendants' removal of those trademarks. From the court's review, plaintiff attempted to bootstrap this renewed motion and its trade dress claim on its original, stronger claim for trademark infringement, but that effort fails. Perhaps plaintiff can gather proof to demonstrate that: (1) it has a trade dress with identifiable elements; (2) it has acquired secondary meaning; and (3) defendants' continued use of the same design, layout and color scheme as it previously used in operating the E&G restaurant is

---

[3] This evidence also goes to whether plaintiff has demonstrated that its unidentified trade dress -- which the court assumes is not inherently distinctive -- has acquired secondary meaning, another element which plaintiff utterly fails to address in its factual submissions and briefing. *See generally* 1 *McCarthy on Trademarks* § 8:11.

likely to cause confusion.[4]  However, its proof in support of this preliminary injunction is still sorely lacking.  As such, the court concludes that it has not demonstrated a better than negligible likelihood of success on the merits of its trade dress claim warranting preliminary relief.

**III. Breach of Non-Compete Provision / Operation of Competitive Business**

Plaintiff also contends that defendants' operation of another sandwich shop in the same location of the former E&G restaurant violates the non-compete provision in the parties' Franchise Agreement.  As described above, the Agreement contains a post-termination provision, which restricts defendants from engaging in any "Competitive Business" within 5 miles of the franchised business.  (Wolf Aff., Ex. A (dkt. #35-1) ¶ 24.2.) "Competitive Business" is defined as "any quick service restaurant that derives more than 50% of its revenue from the sale of sandwiches . . . ."  (*Id*. at ¶ 2.2.)

The merits of plaintiff's claim, or its ability to show a likelihood of confusion turns on whether defendants derive more than 50% of their revenue from the sale of "sandwiches."  Plaintiff relies on dictionary definitions defining "sandwich" as "two or more slices of bread or a split role having a fil[l]ing in between," and that a "wrap" is a "kind of sandwich" to argue that the "overwhelming majority of the Defendants['] offerings are *sandwiches*," and that defendants "clearly anticipate generating the bulk of their revenue

---

[4] While the court would normally march through the various factors to determine whether there is a likelihood of confusion, *see Ty, Inc. v. Jones Groups, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001), the lack of identification of the trade dress makes such an exercise largely pointless.  Moreover, plaintiff's failure to put forth sufficient evidence to demonstrate a likelihood of success that the trade dress is protectable forms a sufficient basis to deny injunctive relief as to the trade dress infringement claim.

from sales of those items, or else they would be offering something else." (Pl.'s Opening Br. (dkt. #33) 13-14.)

For their part, defendants challenge plaintiff's definition of sandwich to include items other than the cold sub sandwiches defendants sold while operating the E&G restaurant. Defendants argue that the meaning of the word turns on the parties' intent "as of the time of contracting, and according to its common usage in the industry." (Defs.' Opp'n (dkt. #51) 16-17 (citing *Columbia Propane, L.P. v. Wis. Gas Co.*, 2003 WI 38 ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776 ("[A] contract is to be interpreted in the manner that it would be understood by persons in the business to which the contract relates."))).) Specifically, defendants explain that "[a]t the time the Franchise Agreement was entered into, the only sandwiches the parties could have intended to refer to were the only entrees E&G offered, cold sub-sandwiches." (*Id.* at 17.) With this narrow definition, defendants submitted evidence, as described above, showing that its sale of cold sub sandwiches was less than 50% of its sales, and decreasing overtime for July, August and September. (Aubrey Janik Decl. (dkt. #52) ¶ 40; *id.*, Ex. 3 (dkt. #52-3) (cold sub sandwiches comprised 39% of Nemo's sales in July, 28% in August and 19% in September).)

The meaning of "sandwiches" in the non-compete provision of the Franchise Agreement is a question of fact, which on this limited record, would be difficult for the court to make a determination, even on a preliminary basis. Even assuming plaintiff has made an adequate showing as to the likelihood of success of its contract claim, however, plaintiff has failed to demonstrate that it would suffer irreparable harm if an injunction is not entered.

Plaintiff principally hangs it hat on the fact that the Franchise Agreement provides that any violation of the non-competition agreement constitutes irreparable harm for which no adequate remedy may be available. (Wolf Aff., Ex. A (dkt. #35-1) ¶ 24.3.) The court acknowledges, as the parties do, that this provision is persuasive evidence of irreparable harm, but it is not conclusive. *See Baskin-Robins Inc. v.* Patel, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003). Here, the undisputed facts demonstrate that E&G has *no* restaurants in Plano, nor in the surrounding Dallas area, *nor in Texas more generally*.[5] Indeed, the closest franchised restaurant is some 600 plus miles away in Colorado.[6] Accordingly, there is simply *no* basis for finding that defendants' new restaurant could divert customers, or otherwise compete, with an existing E&G franchised restaurant.

In an attempt to fill this apparent void, plaintiff understandably argues that "E&G may have difficulty attracting another franchisee to the area given that there is already a competitor [Nemo's] offering the 'same' products in the marketplace." (Pl.'s PFOFs (dkt. #34) ¶ 48 (citing Wolfe Aff. (dkt. #35) ¶ 43).) However, plaintiff stops short of representing that it *is* attempting to locate another franchisee in the Plano area, and, the evidence in the record -- that all three Texas franchisees have closed -- would appear to belie such a representation. To the extent plaintiff can show serious efforts to secure a franchisee in or around Plano, and it encounters hurdles because of Nemo's, the court would be willing to reconsider this view, although plaintiff would need to develop the

---

[5] The two other Texas E&G franchised restaurants that opened around the same time as plaintiff's have also closed. (Janik Aff. (dkt. #52) ¶ 4.)

[6] *See* Hank Janik Decl. (dkt. #53) ¶ 3.

record further as to this possible economic harm.

Whether viewed as a lack of protectable business interest justifying this restriction on free competition as defendants argue (*see* Defs.' Opp'n (dkt. #51) 16), or simply a failure to demonstrate irreparable harm, the court concludes that the non-compete provision barring defendants from operating a "Competitive Business" within five miles of the prior E&G restaurant does not form a basis for preliminarily enjoining defendants' operation of Nemo's, although it may still be a basis for monetary relief.

ORDER

IT IS ORDERED that:

1) plaintiff E&G Franchise Systems, Inc.'s renewed motion for preliminary injunction (dkt. #32) is DENIED;

2) the hearing scheduled for November 1, 2018, is REMOVED from the court's calendar.

Entered this 31st day of October, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge